[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 11-10475;  11-11116
_____

D.C. Docket No. 1:05-cv-22637-AJ

FLORIDA TRANSPORTATION SERVICES, INC.,
a Florida corporation,

Plaintiff-Appellee-
Cross-Appellant,

versus

MIAMI-DADE COUNTY,
a political subdivision of the State of Florida,

Defendant-Appellant,
Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(December 28, 2012)

Before HULL and COX, Circuit Judges, and WALTER,[*] District Judge.

HULL, Circuit Judge:

This appeal involves a county ordinance for permitting stevedores at the Port of Miami in Miami-Dade County, Florida. Stevedores load and unload millions of dollars in cargo in interstate and foreign commerce at the Port each year. Stevedore permits expired annually and a county ordinance required each stevedore company each year to reapply and be reassessed, along with any new applicants, as to competency, safety record, financial strength, and need.

Plaintiff Florida Transportation Services, Inc. ("FTS") filed suit against Defendant Miami-Dade County ("the County"), which owns and operates the Port. The crux of FTS's complaint is that the County's Port Director did not follow the ordinance's requirements at all but instead protected incumbent stevedores and kept out new entrants and competition, like FTS, by rubber-stamping and automatically renewing permits for all existing stevedore permit holders at the Port and automatically denying permits to all new applicants in violation of the dormant Commerce Clause.

The district court granted partial summary judgment for Plaintiff FTS as to

_____

[*] The Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

2

liability, concluding the County's denial of permits to FTS in 2003, 2004, and 2005 violated the dormant Commerce Clause. The district court then held a jury trial as to damages. The jury awarded $3.55 million in damages to FTS for lost profits in 2003, 2004, and 2005.

The County appeals the district court's (1) grant of partial summary judgment for FTS as to the County's liability for denying stevedore permits to FTS in 2003, 2004, and 2005, and (2) denial of the County's motions for judgment as a matter of law as to damages, made both at the close of the evidence and later after the jury's damages award. After review and oral argument, we affirm.

## I. BACKGROUND[1]

We first recount how the County's Port Director used the permit process to protect the incumbent stevedore permit holders at the Port of Miami from any new entrants and competition in that local market.

## A. Port of Miami and the Stevedore Permit Ordinance

The Port of Miami is one of the busiest ports in the nation, fully engaged in interstate commerce, predominantly foreign commerce. For instance, from 2003 through 2005, the Port handled over nine million tons of cargo each year, 39%

---

[1] The facts in this case are largely undisputed. Some are based on the evidentiary record, but most of the facts in this section are from the parties' Joint Stipulation on Material Factual Issues, dated October 26, 2007. The difficulty in this case derives not from the facts but from whether the facts establish a violation of the dormant Commerce Clause.

exported and 61% imported, and around 3.5 million cruise passengers carried on between 719 and 850 cruise ships. From 2002 through 2006, 27% of the trade in the Port was with the Far East, 25% with South America, 17% with Europe, and less than a third of 1% with North America.

Stevedoring is an essential component of the Port. Stevedores load and unload cargo at port facilities. Each year, stevedores move millions of dollars of goods in interstate and foreign commerce through the Port of Miami. The rates stevedores charge are established through an individual agreement between (1) the stevedore and (2) the contracting shippers or cruise lines. The County does not regulate the rates that stevedores charge. But to operate at all in the Port of Miami, the stevedore must obtain a permit from the County, which is the hard part.

The first step—the license—is easy. The County's ordinance requires a person to have a County-issued license in order to act as a stevedore anywhere in Miami-Dade County, Florida. Miami-Dade County, Fla., Code of Ordinances ("Miami-Dade County Code") § 28A-6.1.[2]

The second step is the problem here. If the licensed stevedore wants to operate at the Port of Miami, the same County ordinance requires that person also

---

[2] Miami-Dade County Code § 28A-6.1 states, "No person, shall act as a stevedore within Miami-Dade County, Florida, unless such person is a natural person and has first obtained a stevedore license from the Board [of County Commissioners] after examination."

4

to have a stevedore permit issued by the Director of the Port of Miami. Id. § 28A-6.2.[3] The County Manager and Port Director "shall, after examination, issue stevedore licenses and permits, respectively, to competent and trustworthy persons in such numbers as they deem necessary for the efficient operation of the county waterfront and Port of Miami facilities." Id. § 28A-6.4(c) (emphasis added). To demonstrate that an applying stevedore is competent, the Port Director requires the applicant to provide satisfactory proof that it has trained and experienced personnel to operate the Port's cranes and other equipment. Specifically, the Port Director's Requirement for Competence states:

> For any stevedore firm to be issued a permit to work at the Port, it is of utmost importance from a safety and financial risk standpoint that they demonstrate that they are competent to perform the services of a stevedore.
> . . . .
> To demonstrate that a stevedore firm is competent, they should provide proof that they employ highly trained personnel with specific experience to safely operate the Port of Miami's cargo gantry cranes and other equipment to be utilized at the Port. A demonstrated safety record could assist in determining the level of competency of a stevedore firm.
> . . . .
> A stevedore permit can and should be denied pending the satisfactory demonstration that the applying stevedore firm has competent personnel and equipment.

---

[3] Miami-Dade County Code § 28A-6.2 states, "No person shall act as a stevedore within the Port of Miami without first having obtained a stevedore permit from the Director [of the Port]. . . . The Director shall not consider an application for a stevedore permit unless the applicant has a stevedore license or employs a natural person so licensed."

5

The County's ordinance further prescribes nine broad categories of criteria that govern the Port Director's issuance of a Port of Miami stevedore permit, including "[t]he inability or refusal of license or present permit holders, respectively, to adequately serve new or existing business," Miami-Dade County Code § 28A-6.4(c)(5); "[t]he financial strength of the applicant, including the ability to secure insurance, indemnity and performance bonds," id. § 28A-6.4(c)(6); and "[t]he experience of the applicant, its affiliates, principals or operating officers," id. § 28A-6.4(c)(8).[4]  Further, "[t]he Port Director, in making his determination as to the issuance or denial of the permit, shall, in addition to the [nine broad categories of] criteria . . . [,] make findings as to the need or lack of need for such permit."[5]  Id. § 28A-6.4(b).  In summary, the Port Director must make competency, safety record, financial, and needs assessments in considering the issuance or denial of a permit.

---

[4] Additional criteria for the issuance of new stevedore permits include "[t]he total and peak quantities of passengers or freight," Miami-Dade County Code § 28A-6.4(c)(2), "[t]he frequency of dockings," id. § 28A-6.4(c)(3), "[t]he pendency or entry of any proceeding, judgment or order of any court or regulatory body respecting the ability of the applicant . . . to conduct a stevedoring business," id. § 28A-6.4(c)(7), and "[e]fficient operation of the port," id. § 28A-6.4(c)(9).

[5] The ordinance does not clarify how the requirement that the Port Director assess the inability of present permit holders to serve new or existing business differs from the requirement that the Port Director make findings as to "the need or lack of need" for a permit.  The ordinance also does not describe what type of findings the Port Director must make to assess the need for issuing the stevedore permit.

6

Port of Miami stevedore permits expire annually and automatically on January 15 of each year.  Id. § 28A-6.6.  Therefore, each and every stevedore, including existing permit holders, must apply or reapply each year.  Importantly here, the County's ordinance provides that the Port Director may renew an expiring permit, but only if the renewal application meets the criteria for the issuance of a new permit.  Id.  Thus, the County's ordinance facially subjected new and renewal applications to the same competency, safety record, financial, and needs criteria.  However, as explained below, the Port Director did not abide by the ordinance and did not make these assessments annually.  Rather, the Port Director in practice automatically renewed permits of existing permit holders and repeatedly denied permits to new applicants like FTS.  Before detailing the County Port Director's permitting practices, we review who held stevedore permits and the stevedore market at the Port of Miami.

**B. Permitted Stevedores, 2002–2007**

As of 2002, nine companies held stevedore permits for the Port of Miami.  About half of these companies were based or incorporated out-of-state, and about half were in-state.  These permit-holder companies were: (1) Seaboard Marine, a wholly owned subsidiary of Seaboard Corp., which was based in Kansas; (2) Universal Maritime Service, a New York company; (3) Eller-ITO, a joint venture

7

between (a) Continental Stevedoring and Terminals, whose location is not indicated in the record, and (b) Ports America, a New Jersey corporation;[6] (4) Ports America Florida,[7] which was owned by Ports America; (5) R.O. White & Company ("R.O. White"), a Florida company; (6) Hallmark Stevedoring, a Florida company; (7) Florida Stevedoring, a Florida company; (8) Oceanic Stevedoring Company, whose location is not indicated in the record; and (9) Biscayne Stevedore Agency, Inc., whose location is not indicated in the record.[8]

As of 2007, seven of these nine companies—Seaboard Marine, Universal Maritime Service, Eller-ITO, Ports America Florida, R.O. White,[9] Hallmark Stevedoring, and Florida Stevedoring—still held stevedore permits.

The two stevedore permit holders in 2002 that do not appear on the 2007 list

---

[6] The affidavit of Ray Mauri, Chief of Finance of the Miami-Dade County Seaport Department, indicates that Eller & Co., rather than Continental Stevedoring and Terminals, jointly owned Eller-ITO with Ports America. However, the parties' factual stipulation indicates that Continental is the joint owner, and states:

> The current owners of POMTOC are partners that are licensed and permitted stevedoring concerns: Florida Stevedoring, Inc., Continental Stevedoring and Terminals, Inc., and Ports America (or an affiliate) (Continental and Ports America (or an affiliate) are joint venture partners in the port permitted stevedoring company Eller-ITO); in addition, Ports America (or an affiliate) also has a port stevedoring permit.

[7] Ports America Florida operated previously as P&O Ports Florida.

[8] Eller-ITO and Florida Stevedoring did not operate outside of Florida.

[9] New Jersey-based Ceres Terminals, Inc. purchased R.O. White sometime in 2005.

8

are Biscayne Stevedore Agency and Oceanic Stevedoring.  Biscayne last held a stevedore permit in 2005 and did not submit a renewal application in 2005 or beyond.  Oceanic appears either to have been acquired by another company or was defunct by 2007.  The parties do not dispute the fact that existing permit holders who wanted permit renewals got them annually between 2002 and 2007.[10]

Importantly, too, at least three of the companies on the 2002 and 2007 lists—Seaboard Marine, Ports America Florida, and R.O. White—had their permits renewed even though they were not providing stevedore service.[11]  This meant that at most six of nine permitted stevedores cornered the Port of Miami market in 2002 and at most four still did in 2007.  Those four were: Florida Stevedoring, Eller-ITO, Universal Maritime Service, and Hallmark Stevedoring.  As discussed later, the Port Director, year after year, refused to grant a permit to FTS to enter the local market and compete with these incumbent stevedore permit holders.

## C.  Stevedore Market at Port of Miami

It is helpful to explain other undisputed aspects of the stevedore market at the Port of Miami.

---

[10] The record does not include a complete list of stevedores permitted in each year during the relevant 2003 to 2005 period, but it does show who was permitted in 2002 and in 2007.

[11] Notably, though, Seaboard Marine and Ports America Florida were otherwise integrally involved in the stevedoring industry at the Port of Miami, as discussed below.  And R.O. White had held a stevedore permit at the Port since 1994.

Seaboard Marine operated a main cargo terminal at the Port.  Seaboard Marine was also a shipper and a stevedore permit holder.  The Port Director annually renewed Seaboard Marine's stevedore permit from 2002 to 2007.  Notably, though, Seaboard Marine did not provide stevedore services for itself or third parties, even though it held one of the few stevedore permits at the Port.  Rather, Seaboard Marine employed another permitted stevedore, Eller-ITO, for Seaboard Marine's own shipping from at least 2003 to 2005.  Thus, a sole stevedore served one cargo terminal.

Maersk, Inc. operated another main cargo terminal at the Port of Miami, and wholly owned Universal Maritime Service, a permitted stevedore.  Universal Maritime Service, as a stevedore, served only Maersk.

There was little competition elsewhere at the Port.  The third main cargo terminal at the Port was operated by the Port of Miami Terminal Operating Company ("POMTOC"), a Florida limited liability company.[12]  POMTOC itself was not a stevedore and never held a stevedore permit.  Rather, as detailed below, POMTOC operated the third main cargo terminal, and POMTOC's owners, in effect, provided the stevedore services at that terminal.

_____

[12] POMTOC was formed in 1994 by four smaller cargo terminal operators to facilitate investment in Port facilities and to improve the Port's capacity.  Upon its formation, POMTOC contracted with the Miami-Dade Board of County Commissioners to consolidate the Port's several smaller cargo terminals and operate an improved third main cargo terminal.

10

During the relevant time in this case, there were three owners of POMTOC: (1) Florida Stevedoring, a stevedore permit holder, (2) Ports America Florida, another stevedore permit holder, and (3) Continental Stevedoring and Terminals, which jointly owned permit holder Eller-ITO with Ports America.

POMTOC's owners used their status as operators of the third main cargo terminal to squelch competition in the Port of Miami stevedore market. A POMTOC official testified that POMTOC would not allow non-POMTOC-affiliated stevedores to serve shippers at POMTOC's cargo terminal. Indeed, POMTOC's website listed Florida Stevedoring and Eller-ITO as the only "stevedores servicing POMTOC."

As noted above, this same Eller-ITO provided the stevedore services to Seaboard Marine at its terminal. And, R.O. White, a stevedore permit holder unaffiliated with POMTOC, was unable to serve shipping companies who wanted to hire R.O. White for stevedoring because POMTOC restricted terminal access to Eller-ITO and Florida Stevedoring. At the same time, Ports America Florida, the third POMTOC owner, had its permit renewed by the Port Director even though it does not appear to have provided any stevedore services.[13] Simply put,

---

[13] The district court noted that the Port renewed Ports America Florida's stevedore permits despite Ports America Florida's not providing stevedore services at the Port. Fla. Transp. Serv. v. Miami-Dade Cnty., 757 F. Supp. 2d 1260, 1272 (S.D. Fla. 2010). It appears that Ports America Florida (formerly P&O Ports Florida) was owned by Ports America, which co-

11

POMTOC's owners controlled the market for third-party stevedore services at its cargo terminal and limited the stevedore competition to two permit holders: Eller-ITO and Florida Stevedoring.[14]

## D. Port Director's Permitting Practices

With this background, we turn to the Port Director's permitting practices. In 1999 and 2002, the Port Director conducted so-called "needs assessments" as to stevedores, ostensibly to satisfy one of the stevedore permit ordinance's requirements, i.e., to determine "the need or lack of need" for a permit. See Miami-Dade County Code § 28A-6.4(b). The Port Director contacted each of the Port's five largest cargo carriers by telephone and asked five questions related to the cargo carriers' use of and satisfaction with stevedores at the Port of Miami.[15]

owned Eller-ITO. See supra note 7. Eller-ITO held a stevedore permit and provided stevedore services at the Port.

[14] As discussed in the damages section, infra, FTS contends that it could have competed against these POMTOC-related stevedores for Seaboard Marine's stevedore work at Seaboard Marine's cargo terminal.

[15] The Port Director asked the same five questions in both 1999 and 2002. Those questions were:
> (1) In the last year, how many stevedore companies have you used at the Port of Miami?
> (2) Typically how many stevedore companies would you solicit rates from per vessel? If not, how often?
> (3) If you only use one or two stevedore firms, why?
> (4) Have you ever not been able to load or unload a vessel due to a stevedore problem at the Port of Miami?
> (5) In comparison with other ports how would you rate the efficiency of stevedores at the Port of Miami, say, on a 1 (lowest) – 10 (best) scale?

12

Based on these telephone surveys, the Port Director concluded in both 1999 and 2002 that "there are sufficient levels of current stevedore services in terms of quantity, efficiency and competitiveness to meet the Port's needs."

The record shows these "needs assessments" were conducted only to protect the economic interests of the existing stevedore permit holders. In litigation between FTS and the County in 1999, the Port Director even admitted in a verified pleading that:

> issuing additional permits when insufficient need exists can dilute the market to the extent of causing economic hardship to the entire local stevedoring industry. It is for this reason that Code Section 26A-6 requires the Port Director to make a determination of need prior to issuing any new Stevedore Permits.[16]

Port documents from 2000 acknowledge that the Port would ensure that the "granting or renewal of a permit does not lead to duplication of services that could lead to destructive competition" at the Port. In deposition testimony, the Port Director considered this statement about preventing "destructive competition" to be consistent with the needs assessment requirement in the County's permit ordinance. Additionally, the needs assessments did not address any of the other

---

The five cargo carriers surveyed included Maersk and Seaboard Marine.

[16] Port Director Charles A. Towsley was the Port Director at all times relevant to the instant case.

13

ordinance requirements, such as the applicant's competency, financial ability, or safety record.

Sometime in or before 2002, the Port Director did approve the new application of Seaboard Marine for a stevedore permit.[17]  The County stresses that Seaboard Marine was the only applicant from out-of-state during 1999 to 2007, while Plaintiff FTS is a Florida corporation.  In response, FTS emphasizes that the Port Director granted and repeatedly renewed a stevedore permit for Seaboard Marine, even though Seaboard Marine did not provide stevedore services, but yet denied permits to Plaintiff FTS, which wanted to provide stevedore services.  Moreover, despite its out-of-state origin, Seaboard Marine was already entrenched in the local market long before obtaining a stevedore permit in 2002, in that Seaboard Marine operated one of the Port's three main cargo terminals and exclusively used incumbent stevedore Eller-ITO for stevedore services at the Port.  Indeed, Seaboard Marine has operated its cargo terminal at the Port for over twenty years.

Unlike in 2002, the Port Director conducted no needs or any other criterion

_____

[17] The record does not show exactly when the Port Director awarded Seaboard Marine's first stevedore permit.  Tom Paelinck, vice-president of Seaboard Marine, indicated that Seaboard Marine applied for a stevedore permit in 2001.  Seaboard Marine appears on a list of stevedores permitted in 2002.  In addition, the record shows that Seaboard Marine remained a permitted stevedore in 2007.

14

assessments in 2003, 2004, or 2005.  Rather, from 2003 to 2005, the Port Director

consistently and automatically (1) approved applications for existing permit

holders and (2) denied permits to new applicants.  Although the ordinance required

that permits be renewed only if all applicable requirements (including competency,

financial, safety record, and needs assessments) were met, the Port Director

renewed existing permits without conducting any of the required assessments.[18]

The Port Director concedes that at times incumbent stevedore permit

holders—such as Seaboard Marine, R.O. White, or Ports America Florida—had

their permits renewed even though they were not doing any stevedore work at the

Port.  From 2003 to 2005, the Port Director also kept out any new entrants and thus

any competition against the limited number of incumbents in the local market that

actually provided stevedore services.  Yet FTS repeatedly applied for a new

stevedore permit from 1999 to 2005 and was automatically denied a permit by the

Port Director.  The Port Director's practice of automatically approving renewal

applications and denying new applications (1) protected incumbent stevedore

---

[18] The district court found that abundant, undisputed evidence showed that the Port Director applied the permit ordinance in this fashion.  Fla. Transp. Serv., 757 F. Supp. 2d at 1277, 1278 n.7.  The County did not dispute this fact either in the district court or on appeal.  Further, during the jury trial on damages, the Port Director admitted that he automatically denied applications for new stevedore permits and automatically granted applications for permit renewals.

15

permit holders, and (2) barred the entry of new competitors to the Port of Miami

stevedore market.

## E. FTS's Applications for a Permit

Plaintiff FTS already provided stevedore services in Broward County,

Florida, its principal place of business. Despite repeated attempts, FTS was unable

to expand its business to the Port of Miami in Miami-Dade County.

FTS is not a shipper, a cruise line or a Port of Miami cargo terminal

operator. FTS simply wanted a permit in order to provide stevedore services to

third parties at the Port.[19] In other words, FTS sought entry into what is termed the

"third-party" stevedore market at the Port of Miami.

Obtaining a Miami-Dade County stevedore "license" was not a problem.

Since 1979, FTS President John Gorman has held the requisite stevedore license

for Miami-Dade County.[20] Obtaining a stevedore "permit" for the Port of Miami

was impossible. In each year from 1999 to 2005, FTS applied to the Port of Miami

---

[19] During the relevant time, FTS did not lease land at the Port of Miami or otherwise contract for access to the Port's cargo terminals. FTS also did not have any legally enforceable commitments from shippers or cruise lines for FTS to provide stevedore services at the Port. As explained later, FTS claimed if it got a permit, it would have charged rates lower than the others and would assuredly have gotten business.

[20] Pursuant to Miami-Dade County ordinance, only a natural person may hold a stevedore license. Miami-Dade County Code § 28A-6.1. However, corporations and partnerships may hold stevedore permits at the Port of Miami (but not elsewhere). Id. § 28A-6.2.

for a stevedore permit.  In each of these years, the Port Director denied FTS's permit application on the basis that no new stevedores were needed at the Port.[21]  In 2003, 2004, and 2005, the Port Director merely sent FTS a form letter denying FTS's permit application and stating no additional stevedores were needed at the Port.[22]

Notably, one day after FTS first applied for a stevedore permit in 1999, a Port employee, mistakenly believing FTS was an existing permit holder seeking renewal, awarded the permit.  The next day, the Port Director held the permit in abeyance and explained in a letter to FTS that the permit was granted without the requisite needs assessment.  The Port Director ultimately never granted FTS a permit in 1999 or in 2000 to 2005.

## F.  Allegations in Complaint

In October 2005, FTS filed a one-count complaint against Miami-Dade

---

[21] In 1999, the Port Director denied FTS's permit application on the additional basis that FTS personnel were not qualified to operate equipment at the Port and that FTS had a poor safety record.

[22] In 2003, 2004, and 2005, the form letters rotely stated that the Port Director had "considered the criteria and procedures outlined in Chapter 28A of the Code of Miami-Dade County," but it is undisputed the Port Director did not do this.  Instead, the Port Director just automatically approved applications of existing permit holders and denied those of any new entrants.

17

County under 42 U.S.C. § 1983.[23]  FTS's complaint alleged that Miami-Dade County "violated the Commerce Clause through its establishment and use of a permitting process that effectively allows only the owners of Miami-based Port of Miami Terminal Operating Company, L.C. ('POMTOC') to provide third party cargo stevedoring services" at the Port.  FTS alleged that "[a]t all relevant times, no active third party cargo stevedoring competitor of POMTOC's owners, such as FTS, has been granted a permit by the County."  FTS's claim focuses on the County's stevedore permitting practices, through its Port Director, as applied to third-party stevedores, i.e., stevedores who are not affiliated with their shipper-customers.

According to FTS's complaint, the County Port Director's protection of POMTOC's monopoly over the third-party stevedore market violated the Commerce Clause:  "By allowing only the owners of POMTOC, a Miami-Dade County business, to provide such [stevedore] services, the County has unconstitutionally deprived out-of-county businesses such as FTS access to the local market, in violation of the Commerce Clause."  FTS alleged that the County's policy "barred stevedoring competitors such as FTS from engaging in interstate

---

[23] FTS's complaint also named the Port Director as a defendant, but FTS voluntarily dismissed its claims against the Port Director.  Only FTS and the County are parties to this appeal.

18

and international commerce" and "foreclosed use of the Port to national and international carriers who do not wish to pay POMTOC's owners' exorbitant [stevedoring] rates." FTS characterized the Port Director's needs-based denials of its stevedore permit applications as a "sham" and a "pretense" designed to protect POMTOC's monopoly over stevedoring.[24]

FTS's complaint requested declaratory relief and damages due to the County's denial of its permit applications in each year from 1999 to 2005. FTS also requested an injunction enjoining the County from "continuing its unconstitutional conduct and requiring it to take steps to dissipate the harmful effects of its prior conduct by providing FTS with a permit and sufficient land at the Port to operate stevedoring and terminal services."

## G. District Court's Order

After substantial discovery, the parties filed cross motions for summary judgment. In its motion, FTS argued that "the obvious purpose and effect of the County's 'need' ordinance as applied to FTS" was to protect POMTOC's monopoly in the Port's third-party stevedore market, in violation of the Commerce Clause. In a published, amended order, the district court concluded that FTS's

---

[24] The parties agree that no pretrial order modified the allegations or claims in the complaint. We thus rely on the complaint as the authoritative statement of FTS's claims.

19

claims as to the County's denials of its permit applications in 1999, 2000, and 2001 were barred by § 1983's four-year statute of limitations. Fla. Transp. Serv., Inc. v. Miami-Dade Cnty., 757 F. Supp. 2d 1260, 1269–70 (S.D. Fla. 2010). The district court also determined that FTS's claim as to 2002 was barred by the doctrine of res judicata because FTS appealed the County's denial of its 2002 application to an administrative examiner, which affirmed the denial of FTS's application. Id. at 1270–73.[25]

The district court, however, granted summary judgment to FTS with respect to the County's liability for its denial of FTS's stevedore permit applications in 2003, 2004, and 2005. The district court first explained that the Port's permit ordinance, as applied in those years, violated the Commerce Clause by unduly burdening interstate commerce absent a sufficient countervailing County interest. Id. at 1276–81. The district court concluded that "the County has failed to present any public interest warranting the seemingly permanent removal of the Port of Miami's stevedore market from the local, state, and national markets." Id. at 1280. The district court found that "there is no evidence in the record demonstrating that

---

[25] The district court explained that the administrative proceeding met all of Florida's requirements for the application of res judicata and that "Florida Transportation could have asserted its constitutional claims in the administrative proceedings . . . ." Fla. Transp. Serv., 757 F. Supp. 2d at 1271.

20

competition in the stevedore market will have a destructive effect on the Port or its operations if new applicants are allowed to compete with existing permit-holders for the available slots." Id.

The district court rejected the County's argument that it did not violate the Commerce Clause because it acted in a proprietary, rather than a regulatory, capacity in permitting stevedores at the Port. Id. at 1281–82.

The district court then held a jury trial as to FTS's damages resulting from permit denials in 2003, 2004, and 2005. The jury awarded FTS $2.55 million for FTS's profits lost from Seaboard Marine stevedoring contracts and $1 million for profits lost from cruise line stevedoring contracts from 2003 to 2005. The jury awarded no damages for FTS's lost cargo terminal business.

After trial, the district court denied FTS's motion for injunctive relief on the grounds that (1) the County now had abandoned its unlawful stevedore permitting practices, and (2) "a permanent injunction could not effectively give FTS stevedore permits for 2003, 2004, and/or 2005" because permits are valid for only one year and "FTS simply cannot rely on the assumption that, had it been granted permits in 2003, 2004, and 2005, it would have also been granted renewals . . . ."

The County appeals (1) the district court's grant of summary judgment for FTS as to the County's liability for denying stevedore permits to FTS in 2003,

21

2004, and 2005 and (2) the jury's damages award against the County.[26]

## II.  STANDARD OF REVIEW

As to liability issues, we review de novo a district court's grant of summary judgment.  Holloman v. Mail-Well Corp., 443 F.3d 832, 836 (11th Cir. 2006).  Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law.  Fed. R. Civ. P. 56(a); Holloman, 443 F.3d at 836.

As to damages issues, we review de novo the district court's denial of a motion and renewed motion for judgment as a matter of law.  Brough v. Imperial Sterling Ltd., 297 F.3d 1172, 1176 (11th Cir. 2002).  Evidentiary rulings are reviewed for abuse of discretion.  Id. at 1179.

## III.  DORMANT COMMERCE CLAUSE BACKGROUND

### A.  General Principles

The Commerce Clause grants to Congress the power to regulate interstate and foreign commerce.  U.S. Const. art. I, § 8, cl. 3.  "[T]his affirmative grant of

---

[26] FTS cross-appeals the district court's order granting the County's pre-trial motion in limine and excluding from the jury's consideration evidence of FTS's alleged lost profits in 2006 and 2007.  FTS acknowledges that it did not apply for a permit in 2006 or 2007.  We affirm the district court's order because FTS's cross-appeal lacks merit.

authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." Healy v. Beer Inst., Inc., 491 U.S. 324, 326 n.1, 109 S. Ct. 2491, 2494 n.1 (1989).  "This negative command prevents a State from jeopardizing the welfare of the Nation as a whole by placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." Am. Trucking Ass'ns v. Mich. Pub. Servs. Comm'n, 545 U.S. 429, 433, 125 S. Ct. 2419, 2423 (2005) (alteration and internal quotation marks omitted).

In addition to state laws, the dormant Commerce Clause applies equally to local and municipal laws.  "[A] State (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State rather than through the State itself." Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res., 504 U.S. 353, 361, 112 S. Ct. 2019, 2024 (1992).  The dormant Commerce Clause "invalidate[s] local laws that impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State." C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 390, 114 S. Ct. 1677, 1682 (1994) (emphasis added); accord Dean Milk Co. v. City of Madison, 340 U.S. 349, 354, 71 S. Ct. 295, 298 (1951) ("In thus erecting an economic barrier protecting a major

23

local industry against competition from without the State, [the City of] Madison

plainly discriminates against interstate commerce."); S. Waste Sys., LLC. v. City

of Delray Beach, 420 F.3d 1288, 1290 (11th Cir. 2005).

## B. Two-Tiered Analysis

Laws challenged under the dormant Commerce Clause are examined using a

two-tiered analysis.  First, we consider whether the law or regulation "directly

regulates or discriminates against interstate commerce, or has the effect of favoring

in-state economic interests." Island Silver & Spice, Inc. v. Islamorada, 542 F.3d

844, 846 (11th Cir. 2008) (internal quotation marks and alteration omitted).

"Discrimination against interstate commerce in favor of local business or

investment is per se invalid, save in a narrow class of cases in which the

municipality can demonstrate, under rigorous scrutiny, that it has no other means to

advance a legitimate local interest."  Carbone, 511 U.S. at 392, 114 S. Ct. at 1683.

"The central rationale for the rule against discrimination is to prohibit state or

municipal laws whose object is local economic protectionism . . . ."  Id. at 390, 114

S. Ct. at 1682.

Second, if the law or regulation advances a legitimate local interest and has

only "indirect effects on interstate commerce," we apply the balancing test from

Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S. Ct. 844 (1970), and invalidate the

24

law only if "the burden on interstate commerce clearly exceeds the local benefits."

Island Silver & Spice, 542 F.3d at 846 (internal quotation marks omitted).

Thus, the two ways a law can violate the dormant Commerce Clause are

(1) by discriminating against interstate commerce or (2) by unduly burdening

interstate commerce.  We next explain in more detail the ways in which a state or

local law discriminates against interstate commerce.

## C.  Discrimination

"[T]here is no clear line" separating discriminatory from non-discriminatory

state regulations.  Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476

U.S. 573, 579, 106 S. Ct. 2080, 2084 (1986).  Rather, the Supreme Court's

decisions show that state and local laws discriminate in violation of the dormant

Commerce Clause in several ways.

First, a state or local law discriminates by restricting market participation or

curtailing the movement of articles of interstate commerce based on whether a

market participant or article of commerce is in-state versus out-of-state, or local

versus non-local.  See, e.g., Fulton Corp. v. Faulkner, 516 U.S. 325, 333, 116 S. Ct.

848, 855 (1996); Fort Gratiot, 504 U.S. at 361, 112 S. Ct. at 2024; H.P. Hood &

Sons, Inc. v. Du Mond, 336 U.S. 525, 526, 69 S. Ct. 657, 659 (1949).

Second, a state or local law discriminates by conditioning participation in an

25

interstate market on the in-state or local processing of goods.  In other words, a state or local government may not require diversion of resources of an interstate market into the local market to serve local interests.  See, e.g., Carbone, 511 U.S. at 390, 114 S. Ct. at 1682; Dean Milk, 340 U.S. at 354, 71 S. Ct. at 298.

Importantly, a discriminatory law is no less discriminatory because it applies "alike to the people of all the States, including the people of the State enacting such statute."  Fort Gratiot, 504 U.S. at 361, 112 S. Ct. at 2025 (internal quotation mark omitted); accord Dean Milk, 340 U.S. at 354 n.4, 71 S. Ct. at 298 n.4 (explaining that local ordinance's subjecting non-local, in-state residents to same proscription as out-of-state residents is "immaterial" to dormant Commerce Clause analysis); see Carbone, 511 U.S. at 393–94, 114 S. Ct. at 1683–84 (invalidating local waste disposal ordinance that required both in-state and out-of-state waste disposal companies to use local processing facility).  A state or local law may impermissibly discriminate against interstate commerce even if that law applies to all.

The Supreme Court's dormant Commerce Clause decisions also show what types of state or local laws are not discriminatory.  A state or local law is not discriminatory where it (1) has incidental negative effects on some (but not all)

out-of-state market participants and (2) does not reduce or curtail access to interstate markets.  See, e.g., Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 98 S. Ct. 2207 (1978).  As we explained in Island Silver & Spice, the fact that "a regulation falls onto a subset of out-of-state [companies] does not, by itself, establish a claim of discrimination against interstate commerce."  542 F.3d at 846 (internal quotation marks omitted); see also S. Waste Sys., 420 F.3d at 1291 ("[T]o the extent that in-state and out-of-state bidders are allowed to compete freely on a level playing [field], there is no cause for constitutional concern.").

**D.  Undue Burden**

Even if a law is not discriminatory, it nonetheless violates the dormant Commerce Clause if it unduly burdens interstate commerce.  A law unduly burdens interstate commerce under Pike if "the burden on interstate commerce clearly exceeds the local benefits."  Island Silver & Spice, 542 F.3d at 846 (internal quotation marks omitted).  In this inquiry, we evaluate the "practical effect of the statute" in light of "what effect would arise if not one, but many or every, State adopted similar legislation."  Healy, 491 U.S. at 336, 109 S. Ct. at 2499.  Notably, "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate

27

supplier to another." Exxon, 437 U.S. at 127, 98 S. Ct. at 2214.

Although these general principles are easy to summarize, they are more difficult to apply. Thus we examine how the Supreme Court and this Court have applied them to specific factual scenarios in dormant Commerce Clause cases.

## IV.  SUPREME COURT AND ELEVENTH CIRCUIT DECISIONS

## A.  Discrimination: Restricting Market Participation or Movement of Articles Based on Location

### 1.  H.P. Hood & Sons, Inc. (1949)

H.P. Hood & Sons, a Massachusetts corporation selling milk in Boston, purchased raw milk from New York milk producers and maintained three receiving depots in New York, which it operated pursuant to a New York state license.[27] H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 526, 69 S. Ct. 657, 659 (1949). Hood sought a license from the New York Commissioner of Agriculture and Markets (the "Commissioner") to operate a fourth receiving depot. Under the New York law, no such license could be granted for an existing business to operate an additional facility "unless the commissioner is satisfied that . . . the issuance of the license will not tend to a destructive competition in a market already served, and

---

[27] The Supreme Court's decision in H.P. Hood does not indicate whether H.P. Hood held a license for each of its receiving depots or whether it held a single license for all three.

28

that the issuance of the license is in the public interest." Id. at 527 n.3, 69 S. Ct. at 659 n.3 (quoting N.Y. Agric. Mkts. Law § 258-c) (emphasis added). The Commissioner denied Hood's license application, finding a new plant would "tend to a destructive competition in a market already adequately served."[28] Id. at 529, 69 S. Ct. at 660.

Hood sued, and the Supreme Court held that the New York statute, as applied, violated the dormant Commerce Clause by discriminating against interstate commerce. The Supreme Court explained that the Commissioner's reason for denying Hood a permit was that its new facility would allow Hood to take business from, and cause shortages in, local New York markets. Id. at 540, 69 S. Ct. at 666. This objective was impermissible because the Commissioner denied Hood's license request "upon the sole and specific grounds that it will subject

---

[28] Specifically, the New York Commissioner explained:

> If [Hood] is permitted to equip and operate another milk plant in this territory, and to take on producers now delivering to plants other than those which [Hood] operates, it will tend to reduce the volume of milk received at the plants which lose those producers, and will tend to increase the cost of handling milk in those plants.   If [Hood] takes producers not delivering milk to local markets such as Troy, it will have a tendency to deprive such markets of a supply needed during the short season.
>
> There is no evidence that any producer is without a market for his milk. There is no evidence that any producers not now delivering milk to [Hood] would receive any higher price, were they to deliver their milk to [Hood's] proposed plant.

Id. at 528–29, 69 S. Ct. at 660.

29

others to competition and take supplies needed locally, an end, as we have shown, always held to be precluded by the Commerce Clause."[29]  Id. at 542, 69 S. Ct. at 667.

The Supreme Court rejected the Commissioner's claim that the statute did not discriminate against interstate commerce because Hood already held a license to operate three other New York facilities from which Hood could ship an unlimited amount of milk to Massachusetts.  Id. at 539, 69 S. Ct. at 665–66.  The Supreme Court observed that milk receiving depots must be located close to milk producers, and therefore Hood could not increase its milk distribution by expanding its existing New York facilities.  Id. at 540, 69 S. Ct. at 666.  The Supreme Court stressed that, even though Hood itself was already participating in the New York milk distribution market, the Commissioner's rationale for restricting Hood's operation of a new facility, if permitted, would also allow the state to exclude new entrants in the milk distribution market.  Id.

2.  Fort Gratiot (1992)

While H.P. Hood involved restricting market participation, Fort Gratiot

---

[29]  The Supreme Court also rejected the Commissioner's claim that the licensing statute was authorized by and part of the federal regulatory scheme for the milk market.  H.P. Hood, 336 U.S. at 540–45, 69 S. Ct. at 666–68.

30

Sanitary Landfill, Inc. v. Michigan Department of Natural Resources, 504 U.S.

353, 112 S. Ct. 2019 (1992), shows that restricting the movement of articles of

interstate commerce to protect local businesses from competition also

impermissibly discriminates against interstate commerce.

The Fort Gratiot Court invalidated a Michigan statute that allowed a county

to accept only waste generated in that county and to restrict the import of solid

waste into that county from both in-state and out-of-state (the "Waste Import

Restrictions").[30] Id. at 361, 112 S. Ct. at 2024.  Plaintiff Fort Gratiot operated a

landfill in St. Clair County, Michigan.  Id. at 357, 112 S. Ct. at 2022.  St. Clair

County denied Fort Gratiot's application for authority to accept out-of-state waste

at its landfill.  Id.  Fort Gratiot sued, claiming the Waste Import Restrictions

violated the dormant Commerce Clause.

The Supreme Court struck down the Waste Import Restrictions, which

---

[30] In 1988, Michigan amended its Solid Waste Management Act to provide that:
"A person shall not accept for disposal solid waste . . . that is not generated in the county in
which the disposal area is located unless the acceptance of solid waste . . . that is not
generated in the county is explicitly authorized in the approved county solid waste
management plan."  Mich. Comp. Laws § 299.413a (1991).  In addition, the amended statute
provided: "In order for a disposal area to serve the disposal needs of another county, state,
or country, the service . . . must be explicitly authorized in the approved solid waste
management plan of the receiving county."  Id. § 299.430(2) (1991).

31

applied to both in-state and out-of-state businesses.  The Supreme Court concluded first that "[s]olid waste, even if it has no value, is an article of commerce."  Id. at 359, 112 S. Ct. at 2023.  The Court next found that the Waste Import Restrictions were discriminatory because they afforded "local waste producers complete protection from competition from out-of-state waste producers who seek to use local waste disposal areas."  Id. at 361, 112 S. Ct. at 2024.

Michigan argued that the Waste Import Restrictions "do not discriminate against interstate commerce on their face or in effect because they treat waste from other Michigan counties no differently than waste from other States."  Id. Rejecting this argument, the Supreme Court instructed that "a State (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself."  Id.  In other words, "'a burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the States, including the people of the State enacting such statute.'"  Id. at 361, 112 S. Ct. at 2025 (quoting Brimmer v. Rebman, 138 U.S. 78, 83, 11 S. Ct. 213, 214 (1891)).

The Supreme Court determined Michigan had failed to show that its Waste

32

Import Restrictions "further health and safety concerns that cannot be adequately served by nondiscriminatory alternatives." Id. at 366, 112 S. Ct. at 2027. The Court rejected Michigan's argument that the Waste Import Restrictions were necessary to enable counties to plan for the disposal of future waste. Id. The Supreme Court explained that "Michigan could attain that objective without discriminating between in- and out-of-state waste," by, for example, limiting "the amount of waste that landfill operators may accept each year." Id. at 367, 112 S. Ct. at 2027.

3. Fulton Corp. (1996)

Fulton Corp. v. Faulkner, 516 U.S. 325, 116 S. Ct. 848 (1996), shows that (1) an in-state plaintiff may properly challenge a state law on dormant Commerce Clause grounds, and (2) a state's tax that is based on whether a business is in-state or out-of-state discriminates against interstate commerce.

Plaintiff Fulton Corporation was a North Carolina company that owned stock in other corporations that did business exclusively out-of-state. Id. at 328, 116 S. Ct. at 852. North Carolina law imposed a state "intangibles tax" on corporate stock owned by North Carolina residents, such as Fulton. Id. at 327, 116 S. Ct. at 852.

The tax was assessed according to the stock-issuing corporation's exposure

33

to North Carolina's state income tax.  The more North Carolina income tax the corporation paid, the less a North Carolina resident shareholder owed due to his ownership of that corporation's stock.  Id. at 328, 116 S. Ct. at 852.

Several of the out-of-state corporations whose stock Fulton owned paid no North Carolina income tax, which meant Fulton, an in-state resident, paid a higher intangibles tax than other in-state residents who owned stock in corporations that paid North Carolina income tax.  Id. at 329, 116 S. Ct. at 852.  Fulton challenged the tax under the dormant Commerce Clause.

The Supreme Court struck down the tax.  First, the Supreme Court concluded, "[t]here is no doubt that the intangibles tax facially discriminates against interstate commerce" because "[a] regime that taxes stock only to the degree that its issuing corporation participates in interstate commerce favors domestic corporations."  Id. at 333, 116 S. Ct. at 855.  Importantly, the Fulton Court considered the effect of the North Carolina law on non-party, out-of-state firms—and not just on the in-state plaintiff—in assessing the law's interstate reach.

The Supreme Court ruled that North Carolina could not justify the intangibles tax on grounds that it subjected interstate commerce to a burden already borne by intrastate commerce.  The Supreme Court explained that North Carolina

34

could not show that the intangibles tax approximated the amount of tax on intrastate commerce, the intangibles tax was not substantially equivalent to the state income tax, and North Carolina had no sovereign interest in taxing income earned out-of-state.  Id. at 334–35, 116 S. Ct. at 855–56.

## B.  Discrimination: Conditioning Market Participation on Local or In-State Processing of Goods

1.  Dean Milk Co. (1951)

Dean Milk Company v. City of Madison, 340 U.S. 349, 71 S. Ct. 295 (1951) illustrates the second way a state or local law can discriminate against interstate commerce: by requiring the local or in-state processing of goods.

In Dean Milk, the City of Madison, Wisconsin, passed an ordinance requiring that all milk sold in Madison be pasteurized, processed and bottled at a City-approved plant within five miles of Madison.  340 U.S. at 350, 71 S. Ct. at 296.  Only three milk processors that actually sold milk wholesale and retail in Madison were located within that five-mile radius.  Id. at 352, 71 S. Ct. at 297.

Plaintiff Dean Milk, an Illinois corporation, bought milk from hundreds of farms in Illinois and Wisconsin, pasteurized the milk in Illinois, more than five miles from Madison, and distributed the milk in both states.  Id.  Pursuant to the ordinance, Madison denied a milk-selling license to Dean Milk solely because

Dean Milk pasteurized milk at plants more than five miles from Madison. Id.

Dean Milk sued, claiming the City's ordinance violated the dormant Commerce

Clause. Id. at 350, 71 S. Ct. at 296. The Supreme Court agreed and struck down

the ordinance. Id. at 353, 71 S. Ct. at 297.

The Supreme Court concluded that the City ordinance discriminated against

interstate commerce because the ordinance "in practical effect excludes from

distribution in Madison wholesome milk produced and pasteurized in Illinois." Id.

at 354, 71 S. Ct. at 297–98. The Supreme Court concluded that the City had

"erect[ed] an economic barrier protecting a major local industry against

competition from without the State," and therefore the City ordinance "plainly

discriminates against interstate commerce." Id. at 354, 71 S. Ct. at 298. The fact

that the City ordinance applied equally to in-state milk distributors did not change

the Supreme Court's analysis, for "[i]t is immaterial that Wisconsin milk from

outside the Madison[, Wisconsin] area is subjected to the same proscription as that

moving in interstate commerce." Id. at 354 n.4, 71 S. Ct. at 298 n.4.

The Dean Milk Court recognized the City's interest in the safety and health

of its citizens and their milk supply. Id. at 353, 71 S. Ct. at 297. However, the

Supreme Court determined that "reasonable and adequate alternatives" to the City

ordinance were available. Id. at 354, 71 S. Ct. at 298. For example, the City could

36

(1) charge out-of-town milk processors for the cost of inspecting milk brought to Madison from other areas, or (2) adopt a quality standard based on milk ratings established by the jurisdiction in which the milk is processed.  Because the discriminatory measure was not "essential for the protection of local health interests," the Supreme Court invalidated the ordinance.  Id. at 356, 71 S. Ct. at 299.

Dean Milk shows that local ordinances that isolate local markets from outsiders are discriminatory even when those ordinances apply equally to in-staters and out-of-staters.  This early case illustrates that a law can be discriminatory even without explicitly distinguishing between in-staters and out-of-staters.

2.  C & A Carbone, Inc. (1994)

C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 114 S. Ct. 1677 (1994), is one of several cases in which the Supreme Court struck down a local ordinance requiring an item in commerce to be processed by local companies before being shipped out-of-state.  And like Dean Milk, Carbone shows that even a facially neutral law can be discriminatory, so long as the purpose or effect of the law is to restrict outsiders' access to local markets.  Carbone also demonstrates that a local law applying only to a local resource may nonetheless violate the dormant Commerce Clause and that in considering such an issue, the law's effect on out-of-

state non-parties may properly be considered.

In Carbone, the Town of Clarkstown, New York, replaced a landfill with a new transfer station that (1) received bulk solid waste, (2) separated recyclable from nonrecyclable items, and (3) shipped recyclable waste to a recycling facility and nonrecyclable waste to a landfill or incinerator. 511 U.S. at 387, 114 S. Ct. at 1680. To finance the new transfer station, the Town engaged a "local private contractor"[31] to build and operate the transfer station and to charge a fee for waste the contractor processed at the station. Id. After five years, the contractor would sell the transfer station to the Town for $1. Id.

To guarantee the local contractor steady business, the Town passed a "flow control" ordinance requiring all non-hazardous solid waste in the Town to be deposited first at this new, local transfer station before leaving the municipality.[32] Id.

Plaintiff C & A Carbone, Inc., already operated a recycling center in the Town where it "receive[d] bulk solid waste, sort[ed] and bail[ed] it, and then

_____

[31] The Supreme Court's decision in Carbone does not state explicitly whether the company that built and operated the waste transfer station was located in the Town. However, the majority opinion describes the company as a "local private contractor." Carbone, 511 U.S. at 387, 114 S. Ct. at 1680.

[32] Noncompliance was punishable by fine and imprisonment. "The avowed purpose of the ordinance [was] to retain the processing fees charged at the transfer station to amortize the cost of the facility." Id. at 386, 114 S. Ct. at 1680.

38

ship[ped] it to other processing facilities—much as occur[red] at the [T]own's new transfer station."[33]  Id. at 387, 114 S. Ct. at 1681.  Although Carbone could still receive solid waste, the ordinance required Carbone to bring the nonrecyclable residue from that waste to the Town's new transfer station.  It thus "forb[ade] Carbone to ship the nonrecyclable waste itself, and it require[d] Carbone to pay a tipping fee on trash that Carbone ha[d] already sorted."  Id. at 388, 114 S. Ct. at 1681.

Carbone sued the Town, claiming the ordinance violated the dormant Commerce Clause.  Carbone argued the ordinance excluded competitors (both in-state and out-of-state firms) from accessing a local market and prevented Carbone from shipping the Town's waste out of town and across state lines.  Id. at 387–88, 114 S. Ct. at 1680–81.  The Supreme Court agreed and struck down the ordinance.

The Supreme Court reasoned that "[w]hile the immediate effect of the ordinance is to direct local transport of solid waste to a designated site within the local jurisdiction, its economic effects are interstate in reach."  Id. at 389, 114 S. Ct. at 1681.  In other words, even though the ordinance was directing local waste from Carbone's own facility located in the Town to the transfer station located in

_____

[33] The Supreme Court's decision in Carbone does not state explicitly whether C & A Carbone was located in the Town.  However, the company nonetheless operated a recycling center in the Town.

39

the same Town, the effect of the local ordinance was interstate in reach.  In fact,

Carbone's facility in the Town received and processed waste from places other

than the Town, including from out of state.  By requiring Carbone to send the

nonrecyclable residue of that waste to the new local transfer station at an additional

cost, the ordinance "[drove] up the cost for out-of-state interests to dispose of their

solid waste."  Id.  Thus, the Supreme Court looked at the effect on non-party, out-

of-state firms who contracted with Carbone to show the interstate reach of the

Town's ordinance.  Even as to waste originating in the Town, the ordinance

"prevent[ed] everyone except the favored local operator from performing the initial

processing step" and "thus deprive[d] out-of-state businesses of access to a local

market."  Id.

Based on this analysis, the Carbone Court concluded that the ordinance

discriminated against interstate commerce because "it allow[ed] only the favored

operator to process waste that [was] within the limits of the town."  Id. at 391, 114

S. Ct. at 1682.  The Supreme Court found that "[t]he ordinance is no less

discriminatory because in-state or in-town processors are also covered by the

prohibition."  Id.  Likening the ordinance to invalid laws requiring the in-state

processing of meat, milk and seafood, the Carbone Court explained that "[t]he

40

essential vice in laws of this sort is that they bar the import of the processing service." Id. at 392, 114 S. Ct. at 1683. "Put another way, the offending local laws hoard a local resource . . . for the benefit of local businesses that treat it." Id. The Supreme Court stated that the Town's ordinance "hoards solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." Id. As a result, though the local ordinance did not regulate interstate commerce "in explicit terms," it did so in "practical effect and design." Id. at 394, 114 S. Ct. at 1684.

Notably, the Carbone Court found that the ordinance's favoring a single company—versus merely imposing an in-town processing requirement—only made "the protectionist effect of the ordinance more acute." Id. at 392, 114 S. Ct. at 1683. An in-town processing requirement would allow a competitor to build a processing facility in Clarkstown, just as Madison's milk-pasteurization ordinance would allow Dean Milk to build a pasteurization plant within five miles of Madison. Id. But by limiting processing to a single company, "the flow control ordinance at issue here squelches competition in the waste-processing service altogether, leaving no room for investment from outside." Id.

Finally, the Carbone Court rejected the Town's proffered rationales for the

41

discriminatory ordinance, including the Town's need to ensure the safe handling and treatment of solid waste, especially given the diminished landfill space and escalating environmental-cleanup costs. Id. at 393, 114 S. Ct. at 1683. The Supreme Court pointed out that the Town had "any number of nondiscriminatory alternatives for addressing the health and environmental problems alleged to justify the ordinance in question," including "uniform safety regulations."[34] Id. The Supreme Court concluded, "[s]tate and local governments may not use their regulatory power to favor local enterprise by prohibiting patronage of out-of-state competitors or their facilities." Id. at 394, 114 S. Ct. at 1684.

## C. Non-Discrimination: Laws Affecting Only Some Out-of-State Companies or Effecting a Level Playing Field

Although the laws impermissibly discriminated in H.P. Hood, Fort Gratiot, Fulton, Dean Milk, and Carbone, the Supreme Court held that the law in Exxon did not.

1. Exxon Corp. (1978)

In Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 98 S. Ct. 2207

---

[34] The Court also rejected the Town's financing rationale and explained that "revenue generation is not a local interest that can justify discrimination against interstate commerce." Carbone, 511 U.S. at 393, 114 S. Ct. at 1684.

42

(1978), the Supreme Court found that a state statute that applied to only some out-of-state companies, but not all of them, was not discriminatory and did not violate the dormant Commerce Clause.

At the time, all gas sold in Maryland was produced or refined out-of-state. Id. at 123, 98 S. Ct. at 2212. Out-of-state producers and refiners owned five percent of Maryland's gas stations. Id. The remaining gas stations in Maryland were owned by out-of-state gasoline dealers or independent Maryland gasoline dealers, none of which produced or refined gasoline.

After the 1973 gasoline shortage, the State of Maryland investigated and found that gas stations in Maryland that were owned by refiners had unfair access to gasoline supplies during the shortage. In response, Maryland enacted a statute prohibiting gasoline refiners from operating retail gas stations in the state. Exxon, 437 U.S. at 119–21, 98 S. Ct. at 2211. The statute did not affect any owners of gas stations that were not also gasoline refiners. Id. at 126, 98 S. Ct. at 2214. As a result, the burden of divestiture fell entirely on out-of-state companies that both owned Maryland gas stations and produced or refined gas.

Seven gasoline producers and refiners that owned Maryland gas stations (the "refiners") challenged Maryland's divestiture statute under the dormant Commerce

43

Clause.  The refiners argued that the statute was discriminatory because it protected independent Maryland gasoline dealers from out-of-state competition.  Id. at 125, 98 S. Ct. at 2213–14.[35]

The Exxon Court upheld Maryland's statute because it applied only to out-of-state gasoline dealers that produced or refined gasoline and left other out-of-state gasoline dealers unaffected.  Id. at 125–26, 98 S. Ct. at 2214.  The Exxon Court rejected the refiners' argument that, since the burden of divestiture fell entirely on out-of-state companies, the statute created "a protected enclave for Maryland independent dealers" and discriminated against interstate commerce in the retail gasoline market.  Id. at 125, 98 S. Ct. at 2213–14.  The Supreme Court observed that the statute "create[d] no barriers whatsoever against interstate independent dealers" and therefore applied to only some out-of-state companies. Id. at 126, 98 S. Ct. at 2214.  The statute thus gave "in-state independent dealers . . . no competitive advantage over out-of-state dealers."  Id. The Supreme Court noted that the Maryland statute did not "prohibit the flow of interstate goods, place

---

[35] The refiners relied on the fact that the divestiture requirement affected only out-of-state companies.  Exxon, 437 U.S. at 125, 98 S. Ct. at 2214.  The refiners offered no evidence that the statute would change the total amount of petroleum products shipped into Maryland.  Id. at 123, 98 S. Ct. at 2212.

44

added costs upon them, or distinguish between in-state and out-of-state companies in the retail market." Id.

To the Exxon Court, the fact that the Maryland statute would have no effect on the proportion of in-state versus out-of-state gasoline sold in Maryland distinguished Exxon from Dean Milk. As noted above, all of the gas sold in Maryland came from out-of-state. Id. The Supreme Court reasoned that "[i]f the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market—as in . . . Dean Milk—the regulation may have a discriminatory effect on interstate commerce." Id. at 126 n.16, 98 S. Ct. at 2214 n.16 (citations omitted). The Maryland statute would have no such effect. Id.

The Exxon Court held, "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." Id. at 126, 98 S. Ct. at 2214 (emphasis added).

Next, the Exxon Court concluded that the withdrawal of out-of-state gasoline producers and refiners from the Maryland retail gasoline market was not an impermissible burden on interstate commerce because other out-of-state producers and refiners would replace the missing share of the gasoline supply. Id.

45

The Commerce Clause does not protect "the particular structure or methods of operation in a retail market."  Id. at 127, 98 S. Ct. at 2215.  "[I]nterstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another."  Id. at 127, 98 S. Ct. at 2214.

It is also helpful to review two of our own decisions concluding that a challenged local law, which either applied even-handedly or created a level playing field, was not discriminatory and did not violate the dormant Commerce Clause.

2.  Southern Waste Systems (2005)

In Southern Waste Systems v. City of Delray Beach, 420 F.3d 1288 (11th Cir. 2005), the City of Delray Beach, Florida, issued a request for proposals for a five-year contract to provide exclusive waste collection services in the City.  Id. at 1289.  Five companies submitted bids, and after a public hearing, the City granted the contract to BFI Waste Systems, the lowest bidder.  BFI was an out-of-state corporation.  Id.

Pursuant to the contract, BFI would be the exclusive waste hauler in Delray Beach.  The City would set waste collection rates, but BFI would bill and collect directly from City residents.  BFI would pay the City a five percent franchise fee.

46

Id.  "The City codified the contract by municipal ordinance."  Id.

Southern Waste Systems ("SWS"),[36] which did not submit a bid for the

contract, sought (1) a declaratory judgment that the contract award and the

ordinance violated the dormant Commerce Clause and (2) an injunction against

Delray Beach.[37]  SWS claimed that the contract and ordinance violated the dormant

Commerce Clause by "award[ing] the exclusive right to collect waste in the City to

one company, thereby excluding all other companies—both interstate and

intrastate—from waste collection."  Id. at 1290.

This Court upheld the ordinance and contract.  We explained that due to the

"fair and open bidding process" used by Delray Beach, "there is nothing inherently

discriminatory in the award of an exclusive waste hauling contract" and "[t]here is

nothing in the record to support the claim that the City's actions constituted the

sort of 'local economic protectionism' that the Commerce Clause forbids."  Id. at

1291 (quoting Carbone, 511 U.S. at 390, 114 S. Ct. at 1682).  We stressed that

"there is no cause for constitutional concern" when "in-state and out-of-state

---

[36] The opinion does not specify whether SWS was an out-of-state or in-state company. The opinion states only that SWS conducted business in Florida.  S. Waste Sys., 420 F.3d at 1289.

[37] SWS appears to have had standing to challenge the award of the contract because a Delray Beach company that had contracted with SWS to remove construction and demolition debris was later cited for violating the ordinance.

47

bidders are allowed to compete freely on a level playing [field]." Id. (internal quotation marks omitted).  Rather, we explained that in dormant Commerce Clause cases, "the process by which the contractor is chosen assumes great importance in determining the plan's constitutionality vel non." Id. at 1292.  We added that "in-state interests are not unduly pampered, nor out-of-state competitors unduly burdened, when a municipality awards an exclusive contract to a low bidder (from whatever state or region) after a fair and open bidding process." Id.

### 3. Leib (2009)

The importance of an open and even-handed permit process that is not overt protectionism is also evident in our decision in Leib v. Hillsborough County Public Transportation Commission, 558 F.3d 1301 (11th Cir. 2009).

Moshe Leib, the owner of a Tampa Bay, Florida, transportation service, sought a permit from the Hillsborough County, Florida, Public Transportation Commission ("HCPTC") to operate a Toyota Prius as an "environmentally-friendly" limousine. Id. at 1304.  Concluding that a Toyota Prius was not a "luxury" vehicle, and thus did not meet HCPTC Taxi Rule 1.15's definition of "limousine," HCPTC denied Leib's permit request.[38] Id.  Leib applied for a waiver

---

[38] HCPTC Taxi Rule 1.15 stated:
"Limousine" means any motor vehicle for hire not equipped with a taximeter, with the

48

of the "luxury" requirement, and HCPTC denied the waiver request.

Leib sued, alleging, inter alia, that HCPTC's denial of his permit request violated the dormant Commerce Clause. The district court dismissed Leib's complaint under Rule 12(b)(6) for failure to state a claim. Id. at 1305. Leib appealed.

This Court concluded that Leib's claim failed on the merits because, inter alia, the HCPTC Rule regulated even-handedly and was applied in an even-handed way. Id. at 1311. This Court explained that the dormant Commerce Clause "forbids a state or municipality from impeding the flow of goods and services across state borders, or from favoring in-state economic interests at the expense of out-of-state economic interests." Id. (quoting S. Waste Sys., 420 F.3d at 1290). We instructed that "[t]he first step in assessing violations of the Commerce Clause is to consider whether the law or regulation in question represents an overt form of protectionism, in which case the measure is generally invalid per se." Id.

---

capacity for 15 passengers or less . . . . This definition consists of vehicles which are recognized by the industry as "luxury" vehicles, that are considered as high-end luxury vehicles by the manufacturer and vehicles that have been uniquely modified so as to provide "luxury" limousine service. The "luxury" quality of vehicles will be determined by assessing aesthetics of the interior and exterior of the vehicle, amenities provided to the passenger, spaciousness and comparison to current industry standards for vehicles performing limousine service in Hillsborough County.

Leib, 558 F.3d at 1304.

Applying these principles to Leib's permit request, this Court concluded that HCPTC's Taxi Rule 1.15 was not discriminatory because it "purports merely to regulate travel in the Tampa Bay area" and likely did not "place any special burden on interstate commerce at all." Id. Leib stressed that the HCPTC Rule prohibited all passengers from utilizing his Toyota Prius limousine service, but we explained that Leib's all-passenger argument "suggests that Rule 1.15 burdens in-state and out-of-state commerce equally."[39] Id. Importantly, this Court noted that the Rule did not leave passengers who desire "environmentally-friendly" transportation service with "no alternative options" because "an environmentally-friendly vehicle may qualify as a limousine so long as it meets Rule 1.15's luxury and other requirements." Id. at 1312. In other words, the Rule did not foreclose environmentally-friendly options to passengers.

## D. Undue Burden under Pike

---

[39] In Leib, this Court did point out that "the Rule has not been challenged by an out-of-state business" and that "Leib purports to challenge the Rule from within the state that is the supposed beneficiary of the putative burden on interstate commerce." Leib, 558 F.3d at 1311. But importantly, this Court did not suggest that these facts undermined Leib's standing to sue or rendered him an improper party to the case. Instead, the Leib Court merely noted that the lack of out-of-state plaintiffs and Leib's in-state status undercut Leib's argument that the HCPTC's Taxi Rule 1.15 unduly burdened interstate commerce. In any event, FTS is not a Miami-Dade County stevedore, and thus does not challenge the Port Director's application of the County stevedore permit ordinance from within the municipality that "is the supposed beneficiary of the putative burden on interstate commerce." Id.

50

Even if the law does not discriminate against interstate commerce, it may still violate the dormant Commerce Clause if it places an undue burden on interstate commerce that exceeds local benefits. Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S. Ct. 844 (1970).

In Pike, Plaintiff Bruce Church, Inc., an in-state cantaloupe grower, challenged a state official's application of an Arizona law which required that all cantaloupes grown in Arizona and offered for sale must be packed in regular compact arrangement in closed standard containers. Id. at 138, 90 S. Ct. at 845 (citing Ariz. Rev. Stat. Ann. § 3-503 (1969)). Invoking his authority under that law to approve the method of packing cantaloupes, the state official issued an order that prohibited Bruce Church from transporting cantaloupes from its Parker, Arizona, ranch to nearby Blythe, California, for packing and processing. Id. To comply with that order, Bruce Church would be required to expend $200,000 to construct a packing plant in Arizona. Id. at 140, 90 S. Ct. at 846.

Bruce Church sued the state official, asking a three-judge district court to enjoin the order as unconstitutional under the dormant Commerce Clause. See id. at 138, 90 S. Ct. at 845. After first granting preliminary injunctive relief and permitting discovery, the district court issued a permanent injunction upon the

51

basis that the challenged order constituted an unlawful burden upon interstate commerce.  Id. at 140, 90 S. Ct. at 846.  The Supreme Court affirmed.[40]

On appeal from the district court, the Supreme Court first rejected the state official's argument that the challenged order did not affect interstate commerce because it impacted only intrastate packing of goods before those goods entered interstate commerce.  The Court observed that laws which required certain kinds of processing be done in-state were consistently struck down under the Commerce Clause.  Id. at 141-42, 90 S. Ct. at 847.  Thus, the challenged order here imposed a burden on interstate commerce; the question was only whether it did so unconstitutionally.  Id. at 142, 90 S. Ct. at 847.

The Supreme Court stated as "the general rule" that "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  Id.  Once a legitimate public interest is identified, "the question

_____

[40] Pursuant to 28 U.S.C. § 2281 (repealed 1976), a special three-judge court was convened to consider Bruce Church's application for permanent injunctive relief restraining the execution of a state statute on grounds of unconstitutionality.  See Pike v. Bruce Church, Inc., 397 U.S. 137, 138, 90 S. Ct. 844, 845 (1970).
    The state official directly appealed to the Supreme Court pursuant to 28 U.S.C. § 1253. See Pike, 397 U.S. at 138, 90 S. Ct. at 845.

becomes one of degree." Id. The extent of the burden on interstate commerce "that will be tolerated will depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Id.

The state official attempted to justify the burden on interstate commerce here solely by asserting the state's interest to "promote and preserve the reputation of Arizona growers by prohibiting deceptive packaging." Id. at 143, 90 S. Ct. at 848. More specifically, Arizona wanted Bruce Church to package the cantaloupes in-state so that the high-quality fruit could be advertised as grown in Arizona rather than California. Although recognizing the legitimacy of the state's interest, the Court refused to accord the concern much weight: "The State's tenuous interest in having the company's cantaloupes identified as originating in Arizona cannot constitutionally justify the requirement that the company build and operate an unneeded $200,000 packing plant" in Arizona. Id. at 145, 90 S. Ct. at 849. Here, the nature of that burden was "constitutionally . . . more significant than its extent," because it required business operations to be performed in-state when they could more efficiently be performed elsewhere—a burden typically found "per se illegal." Id. The Court noted that "[s]uch an incidental consequence of a

53

regulatory scheme could perhaps be tolerated if a more compelling state interest were involved," but here the state's interest was "minimal at best." Id. at 146, 90 S. Ct. at 849.  Accordingly, the Court held that the state official's application of the law constituted an unlawful burden upon interstate commerce and thus violated the dormant Commerce Clause.

With this background, we examine the parties' claims on appeal.

## V.  PRUDENTIAL STANDING

The County first argues that FTS lacks prudential standing to challenge the Port Director's stevedore permitting process under the dormant Commerce Clause because both FTS and the County are located in Florida.

A party has prudential standing when, inter alia, the interest the party seeks to protect "is arguably within the zone of interests . . . protected or regulated by the statute or constitutional guarantee in question." Ass'n of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153, 90 S. Ct. 827, 830 (1970) (emphasis added). "The zone of interest requirement is a prudential standing doctrine, not mandated directly by Article III." Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater, 2 F.3d 1514, 1526 (11th Cir. 1993).  This test "requires only that the relationship between the plaintiff's alleged interest and the purposes implicit in the

substantive provision be more than marginal." Id. (alteration and internal quotation marks omitted).

FTS easily meets this bar. FTS asserts its right to provide services to an interstate shipping market at the Port of Miami. FTS claims that the County unlawfully restricted this interstate market to a local monopoly. In addition, FTS is itself a participant in the interstate third-party stevedore market in Broward County and seeks to expand its business into the Miami market. FTS's interest is thus "arguably" protected by the dormant Commerce Clause, which bars municipalities from discriminating against the free flow of interstate commerce or against entry into the local segment of an interstate market.

FTS's Florida residency does not change this analysis. The County cites no case in which this Court or the Supreme Court has dismissed an in-state plaintiff's dormant Commerce Clause claim on grounds that the in-state plaintiff lacked prudential standing. To the contrary, the courts have reached the merits of numerous dormant Commerce Clause cases involving in-state parties, and an entire body of dormant Commerce Clause jurisprudence reflects the disposition of such cases on the merits. See, e.g., United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 347, 127 S. Ct. 1786, 1798 (2007) (upholding

55

municipalities' waste processing ordinance against challenge brought by companies operating in municipalities); Carbone, 511 U.S. at 391–92, 114 S. Ct. at 1682–83 (invalidating town waste processing ordinance in suit by local waste processor against town); Fulton Corp., 516 U.S. at 346, 116 S. Ct. at 861 (striking down North Carolina tax in suit by North Carolina company); W. Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 188, 114 S. Ct. 2205, 2209 (1994) (striking down Massachusetts milk pricing order in suit by Massachusetts-licensed milk dealers); Fort Gratiot, 504 U.S. at 367–68, 112 S. Ct. at 2027–28 (striking down Michigan waste import restrictions in suit by Michigan landfill operator); S. Waste Sys., 420 F.3d at 1291–92 (upholding waste processing ordinance on merits in suit by in-state company); Leib, 558 F.3d at 1311 (holding that dormant Commerce Clause complaint by in-state resident against municipality failed on merits because challenged rule regulated even-handedly and did not burden interstate commerce).

In addition, as noted above, the dormant Commerce Clause may bar municipal laws that protect local economic interests and squelch outside competition, even where in-state and out-of-state companies are affected. See, e.g., Carbone, 511 U.S. at 391–92, 114 S. Ct. at 1682 ("The ordinance is no less discriminatory because in-state or in-town processors are also covered by the

prohibition."); Dean Milk, 340 U.S. at 354, 71 S. Ct. at 298 (invalidating city ordinance requiring all milk sold in the city to be pasteurized within five miles of the city and finding irrelevant the fact that the law also applied to in-state milk processors). That FTS is an in-state company does not per se mean that FTS lacks prudential standing to raise a dormant Commerce Clause challenge.

As these cases show, FTS's interest here is "more than marginal," Church of Scientology, 2 F.3d at 1526, and it thus meets the criteria for prudential standing.

## VI.  ANALYSIS OF FTS'S CLAIMS

We now turn to whether the County's stevedore permit ordinance, as applied by the Port Director, violated the dormant Commerce Clause.[41]

The first question is whether the Port Director's stevedore permitting practices "directly regulate[d] or discriminate[d] against interstate commerce." Island Silver & Spice, 542 F.3d at 846 (internal quotation marks omitted). Specifically, we must determine whether the Port Director's application of the County's stevedore permit ordinance in 2003, 2004, and 2005 directly discriminated against interstate commerce by regulating participation in the interstate stevedore market on the basis of an applicant's local versus out-of-state

---

[41] FTS does not facially challenge the County's stevedore permit ordinance.

origin.  Even if the Port Director's permitting practices did not directly discriminate, the second question is whether the Port Director's permitting regime imposed a (1) "burden on interstate commerce" that (2) "clearly exceeds the local benefits" under the Pike undue burden test.  Id. (citing Pike, 397 U.S. at 142, 90 S. Ct. at 847) (internal quotation mark omitted).

We need not address the first question because we conclude the district court did not commit reversible error in finding that the Port Director's permitting practices unduly burdened interstate commerce under the Pike undue burden test. To explain our conclusion, we start by reviewing the burden imposed on interstate commerce by the Port Director's permitting practices.  We then examine the local benefits and show why the burden "clearly exceed[ed]" those benefits in violation of the dormant Commerce Clause.

## A.  Burden on Interstate Commerce

At the outset, we agree with the district court that the Port Director's permitting practices were not even-handed and were designed to prevent competition.

Port of Miami stevedore permits expired annually.  Miami-Dade County Code § 28A-6.6.  All stevedore permit seekers, both new and old, were required to apply for a permit each year.  Accordingly, the County ordinance required the Port

58

Director to consider permit applicants, both incumbent and new, without regard to whether the applicant held a stevedore permit in the previous year. See id. Indeed, the permit ordinance authorized the Port Director to renew an incumbent stevedore's permit only if the renewal application met the criteria for the issuance of a new permit. Id.

But the Port Director did not apply the permit ordinance in this fashion. As discussed above, the Port Director in 2003, 2004, and 2005 automatically granted new permits to all companies that held permits in the previous year and automatically denied permits to all companies, like FTS, that did not hold permits in the previous year. As this rubber-stamp practice shows, the sole factor that determined whether the Port Director would grant a stevedore application was not need, safety, or any other criterion identified in the County ordinance; it was whether the applicant already had a permit at the Port.

We also note the protectionist[42] motivation underlying these practices. As the Port Director's own statements show, these permitting practices were aimed to

---

[42] We recognize that the terms "protectionist" and "protectionism" are narrowly defined in dormant Commerce Clause jurisprudence. We use the term more broadly here as the permitting practices did not burden only out-of-state competitors. See, e.g., New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273, 108 S. Ct. 1803, 1807 (1988) ("This 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.").

59

prevent competition against incumbent stevedores. The Port Director stated in prior litigation against FTS that the permit ordinance was intended to prevent "economic hardship to the entire local stevedoring industry" that would result from "dilut[ing] the market" with excessive stevedore permits. Port documents from 2000 state that the Port would ensure that the "granting or renewal of a [stevedore] permit does not lead to duplication of services that could lead to destructive competition" at the Port.[43] In 2003, 2004, and 2005, the Port Director dispensed with competency, safety record, financial, and needs assessments altogether in favor of a rubber-stamp procedure clearly designed and intended to protect incumbent stevedores and foreclose new entrants into Miami's local stevedore market. As the district court observed, the Port Director's permitting practices "protected and insulated" the existing stevedores "from any new competition." Fla. Transp. Serv., 757 F. Supp. 2d at 1278; cf. also H.P. Hood, 336 U.S. at 528, 69 S. Ct. at 660 (invalidating licensing statute that conditioned license on assurances that "the issuance of the license will not tend to a destructive competition in a market already adequately served").

The Port Director's regulating access to interstate markets in this manner

---

[43] In deposition testimony, the Port Director considered this statement to be consistent with the ordinance's needs assessment requirement.

plainly burdened interstate commerce. New entrants were effectively shut out, even if they could have provided better service, better equipment, or lower prices than the incumbent stevedores. Fla. Transp. Serv., 757 F. Supp. 2d at 1278. Specifically, FTS elicited testimony suggesting that non-union stevedores—which FTS could provide—would have offered a cheaper alternative to cargo-terminal-operator Seaboard Marine, which used the union stevedore services of Eller-ITO. Additionally, there were concerns that the consolidation trend of existing stevedore permit-holder companies would result in even less stevedore competition at the Port. In fact, Seaboard Marine applied for its own stevedore permit in 2001 because of the prospect of dwindling stevedore options and higher prices as the result of consolidation. There was also evidence that no current shipper or cruise line at the Port would have even considered the business of FTS or any other non-incumbent stevedore company in the absence of a stevedore permit.

Of course, increased costs are insufficient alone to constitute an unreasonable burden on interstate commerce in violation of the dormant Commerce Clause. See, e.g., Exxon Corp., 437 U.S. at 128, 98 S. Ct. at 2215 ("It may be true that the consuming public will be injured by the loss of the high-volume, low-priced stations operated by the independent refiners, but again that argument relates to the wisdom of the statute, not to its burden on commerce.").

61

But we must also evaluate "the practical effect of the statute" by considering "what effect would arise if not one, but many or every, State adopted similar legislation." See Healy, 491 U.S. at 336, 109 S. Ct. at 2499.

The permitting practices here did not simply impose a burden on entry into the Port's stevedore market. It made entry impossible. Parallel stevedore permitting requirements barring new entrants would subject ports' stevedore markets to the whims of the permitting authorities and drive up the price of virtually all goods imported through the nation's ports. But not only prices would be impacted. Other ports' adoption of the Port Director's rubber-stamp practice, a process that disregards the quality of the applicant in favor of the sole criterion of whether the applicant (no matter what the safety record, equipment, or employee training) already has a permit, could result in ports manned by incompetent and unsafe stevedores.

The County does not contest the above characterization of the Port Director's permitting practices or that it excluded new entrants in 2003, 2004, and 2005 to limit permits to incumbent permit holders without examination of the applicant's required competency, safety record, and financial strength, or the needs at the Port. Instead, the County argues that even under the Pike test, FTS must demonstrate that the Port Director's permitting practices had a disparate impact on

62

out-of-state interests, and that FTS failed to do so.  The County says that it has not

denied a stevedore permit to a single out-of-state applicant in ten years.[44]

Even assuming arguendo that a showing of disparate impact must be made

under the Pike undue burden analysis, we conclude that the Port Director's

permitting practices caused such an impact.  To be sure, some of the incumbent

permit holders that received automatic permit renewals were incorporated out-of-

state, or were owned by companies incorporated out-of-state.  But a company's

place of incorporation alone does not decide whether the Port Director's permitting

practices, as applied to FTS, imposed a disparate impact on out-of-state or non-

local companies for the benefit of local companies.  If that were the case, then a

state or municipality's dormant Commerce Clause liability would turn on the

empty formality of where a company's articles of incorporation were filed, rather

than where the company's business takes place or where its political influence lies.

Cf. United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550

U.S. 330, 345, 127 S. Ct. 1786, 1797 (2007) ("Our dormant Commerce Clause

cases often find discrimination when a State shifts the costs of regulation to other

---

[44]  But pursuant to the Port Director's permitting practices in 2003, 2004, and 2005, a new out-of-state applicant would have been denied a permit because it could not have met the sole criterion the Port Director used to issue a permit: whether the applicant already held a permit.

63

States, because when the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected." (internal quotation marks omitted)).  The corporate structure of incumbent permit holder Eller-ITO illustrates this problem.  Eller-ITO was owned in part by Ports America, a New Jersey corporation.  But Eller-ITO did not operate outside of Florida and had been operating in Florida for decades.

We take a functional approach to the question of whether the challenged permitting practices favor "local" companies and in turn burden "non-local" business interests for the purpose of dormant Commerce Clause analysis.  Though some of the permit holders were incorporated out-of-state, all of the permit holders were operating locally at the Port or were otherwise entrenched at the Port as a cargo terminal operator or as co-owner of an operating stevedore.[45]  The Port Director did not deny a permit to a single incumbent permit holder that was already entrenched at the Port in one of those capacities and did not grant a permit to a single stevedore that was not.  Indeed, four of the incumbent permit holders that

_____

[45] The outliers here—e.g., R.O. White and Hallmark—were otherwise entrenched as they had been permitted to operate at the Port long before 2003, 2004, and 2005.  Furthermore, these incumbent permit holders were Florida companies.  R.O. White was a Florida company until its purchase by an out-of-state company in 2005.

64

were either incorporated out-of-state or owned by companies incorporated out-of-state had entrenched relationships with the Port of Miami that predated the grant of their stevedore permits in 2003, 2004, and 2005.  Seaboard Marine, owned by a Kansas company, was a cargo terminal operator and a shipper.  Universal Maritime Service, a New York company, was owned by Maersk, which was a cargo terminal operator and a shipper.  Ports America, a New Jersey company, co-owned permit holder Eller-ITO and owned permit holder Ports America Florida, which in turn co-owned cargo-terminal-operator POMTOC.  These companies may have been incorporated elsewhere, but they either operated locally or had local interests in the Port of Miami apart from their stevedore services.

Accordingly, we conclude that the Port Director's permitting practices plainly burdened interstate commerce.

We next balance that burden against the local benefits the County attributes to the Port Director's permitting practices.

## B.  Local Benefits

Consistent with the County stevedore permit ordinance, the County claims that the local benefits from its permitting practices were (1) "maximiz[ing] Port space and operational efficiencies" in light of the Port's "limited space and resources" and (2) ensuring that stevedore customers had "a skilled, experienced,

65

reliable, properly equipped, and safe pool of Port-permitted stevedores." These local benefits are indeed legitimate. And these interests would have been served by the ordinance if it had been applied as written.

But following the ordinance as written was not the Port Director's practice in 2003, 2004, and 2005. The purposes and benefits identified by the County are not served or even furthered by the Port Director's (1) automatic renewal of permits for incumbent stevedores, (2) automatic denial of permits to new applicants, and (3) wholesale failure to perform the required competency, safety record, financial and needs assessments in 2003, 2004, and 2005.

When performed, the competency, safety record, financial, and needs assessments could both discern the level of need for stevedore services at the Port and ensure the incumbent stevedores remained "skilled, experienced, reliable, properly equipped, and safe." An automatic renewal, however, in no way determines whether an incumbent permit holder currently satisfies any of the criteria in Miami-Dade County Code § 28A-6.1. Rubber-stamping inherently does not allow for an evaluation of, for example, (1) the applicant's competence and trustworthiness; (2) the ability of present permit holders to "adequately serve new or existing business"; (3) "[t]he financial strength of the applicant"; or (4) "the experience of the applicant." Id. § 28A-6.1(c), (c)(5), (c)(6), (c)(8). Indeed, the

66

Port Director renewed the stevedore permits of three incumbent stevedores—R.O. White, Seaboard Marine, and Ports America Florida—that were not doing any stevedore work at the Port, which wholly undermines the County's rationale of "maximiz[ing] Port space and operational efficiencies" given the Port's "limited space and resources."

In sum, while the local benefits identified by the County are legitimate, the Port Director's permitting practices do not rationally contribute to these purported local benefits.  See Raymond Motor Transp., Inc v. Rice, 434 U.S. 429, 447–48, 98 S. Ct. 787, 797 (1978) (striking down Wisconsin highway trailer-length regulation under undue burden test where Wisconsin "failed to make even a colorable showing that its regulations contribute to highway safety"); Pike, 397 U.S. at 146, 90 S. Ct. at 849 (striking down Arizona cantaloupe packing requirement where "the State's interest is minimal at best").

The County argues that the district court should have simply deferred to the County's putative purposes and benefits.  But any deference is not absolute. "[T]he incantation of a [legitimate] purpose . . . does not insulate a state law from Commerce Clause attack.  Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause."  Kassel v. Consol.

67

Freightways Corp. of Del., 450 U.S. 662, 670, 101 S. Ct. 1309, 1316 (1981) (plurality opinion). That is the case here. The permitting practices did not further, but if anything rather disserved, the County's purported purposes and benefits. In addition, the County has not identified any public interest warranting the removal of the local stevedore market at the Port from competition from new entrants (whether these new entrants be out-of-state or in-state). See Fort Gratiot, 504 U.S. at 361, 112 S. Ct. at 2025 ("[A] burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to the people of all the States, including the people of the State enacting such statute." (quoting Brimmer, 138 U.S. at 82-83, 11 S. Ct. at 214) (internal quotation marks omitted)). We also agree with the district court that even if the County had a legitimate interest in preventing destructive competition, such an interest was not served or even furthered by the Port Director's actual permitting practices. The Port Director renewed the permits of at least two stevedores that were not doing any stevedore work at the Port whatsoever, apparently without any deleterious effects.

In any event, the Port Director could have promoted the County's safety and efficiency objectives without barring new entrants in the stevedore market by simply adhering to the County's permit ordinance. See Pike, 397 U.S. at 142, 90

68

S. Ct. at 847 (stating that "the extent of the burden [on interstate commerce] that will be tolerated will of course depend on . . . whether [the local interest] could be promoted as well with a lesser impact on interstate activities"). For example, the Port Director could have (1) subjected <u>all</u> stevedore permit applicants, and not merely new applicants, to the competency, safety record, financial and needs assessments, <u>as required by the County ordinance</u>, and (2) granted permits only to applicants that were "skilled, experienced, reliable, properly equipped, and safe," without regard to whether they were permitted to operate at the Port already. See <u>Locke v. Shore</u>, 634 F.3d 1185, 1193–95 (11th Cir. 2011) (upholding Florida interior designer licensing requirement because statute did "not block entry altogether" and only required designers "to achieve proficiency"), <u>cert. denied</u>, 132 S. Ct. 1004 (2012). These reasonable and less burdensome alternatives would have served the County's purposes, but the actual permitting procedures applied by the Port Director did not.

Ultimately, the record here shows no local benefit rationally furthered by how the Port Director actually applied the stevedore permit ordinance. Rubber-stamping all renewal permit applications and automatically denying all new permit applications simply cannot "maximize Port space and operational efficiencies" or ensure that stevedore customers have "a skilled, experienced, reliable, properly

69

equipped, and safe pool of Port-permitted stevedores." The burden on interstate commerce—effectively removing the Port of Miami stevedore market from the local, state, and national markets and preserving it for a select few privileged permit holders—is significant, whereas the actual permitting practices did not further any local benefits. Thus, the burden necessarily exceeded them. Accordingly, the stevedore permit ordinance as applied violates the dormant Commerce Clause.

## C. Market-Participant Exception

The County next claims that it is immune from dormant Commerce Clause strictures under the market-participant exception. "[W]hen a state or local government enters the market as a participant it is not subject to the restraints of the [dormant] Commerce Clause." White v. Mass. Council of Constr. Emp'rs, Inc., 460 U.S. 204, 208, 103 S. Ct. 1042, 1044 (1983). "The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further." South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 97, 104 S. Ct. 2237, 2245 (1984) (plurality opinion).

We agree with the district court that the market-participant exception does not apply because the County does not provide stevedore services. See Fla.

Transp. Serv., 757 F. Supp. 2d at 1281.  A state or local government may take advantage of the market-participant exception only if the government is a proprietor of goods or services in the relevant market.  For example, in Smith v. Department of Agriculture of the State of Georgia, 630 F.2d 1081 (5th Cir. 1980),[46] this Court considered a challenge to a Georgia regulation providing Georgia residents priority space assignments at a state-owned farmers market.  We rejected Georgia's argument that the market-participant exception saved this regulation because Georgia "neither produce[d] the goods to be sold at the market, nor engage[d] in the actual buying or selling of those goods."  Smith, 630 F.2d at 1083.  Similarly, in South-Central Timber, a plurality of the Supreme Court rejected Alaska's claim that it acted as a market participant by requiring the in-state processing of timber cut on Alaska lands.  467 U.S. at 98, 104 S. Ct. at 2246.  In that case, the Supreme Court plurality concluded that Alaska was a regulator because, inter alia, Alaska did not actually participate in the timber-processing market.  Id.

Likewise, the County's ordinance gives the Port Director the authority to grant or deny stevedore permits to private parties.  These private parties may not

---

[46] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit prior to October 1, 1981.

71

provide stevedore services at the Port of Miami without a Port-issued permit.  But

neither the County nor the Port itself provides or purchases stevedore services.

Rather, the County's only relationship to the stevedore market is through

permitting, which, as illustrated by the County's permit ordinance, is intended to

serve the County's interests of safe and efficient port operations rather than any

proprietary or commercial interest.  <u>See</u> Miami-Dade County Code § 28A-6.4(c).

## VII.  DAMAGES

We next consider whether the district court erred by denying the County's

motion and renewed motion for judgment as a matter of law as to FTS's damages.

Under Federal Rule of Civil Procedure 50, "[a] party's motion for judgment

as a matter of law can be granted at the close of evidence or, if timely renewed,

after the jury has returned its verdict, as long as there is no legally sufficient

evidentiary basis for a reasonable jury to find for the non-moving party."  <u>Chaney</u>

<u>v. City of Orlando</u>, 483 F.3d 1221, 1227 (11th Cir. 2007) (internal quotation marks

omitted); <u>see also</u> Fed. R. Civ. P. 50. "This court, like the district court, must

consider all the evidence, and the inferences drawn therefrom, in the light most

favorable to the nonmoving party."  <u>Brough v. Imperial Sterling Ltd.</u>, 297 F.3d

1172, 1176 (11th Cir. 2002).

We review the evidence introduced at trial, in the light most favorable to

72

FTS, before discussing the sufficiency of this evidence.

## A. Safety and Reliability

FTS introduced evidence that it was a reliable, safe, and competent stevedore to show that it would have received a stevedore permit in 2003, 2004 and 2005 had the Port Director properly applied the County's permit ordinance as written. FTS President John Gorman testified that FTS had no significant safety problems from 1993 to 2005 and that FTS provided stevedore service for Disney Cruise Lines at Port Canaveral, Florida. Edward Gonzalez, Seaboard Marine's president and CEO, testified that FTS had provided stevedoring for Seaboard Marine container vessels in Fort Lauderdale, Florida. Gonzalez could not say anything negative about FTS's stevedore work and had no complaints about FTS's performance. Roland Malins-Smith, the president of shipper Seafreight Agencies, U.S.A., testified that his company had used FTS as its stevedore at Port Everglades, Florida, for 12 years. Malins-Smith stated that his company never had safety concerns with FTS.

Even the Port Director admitted that his letters denying FTS's stevedore permit applications after 1999 did not say anything negative about FTS's competence or safety. The jury also heard evidence that the Port Director automatically granted permit applications of incumbent stevedores and

73

automatically rejected new applicants.  At trial, the Port Director admitted that his rubber-stamp approval process shielded incumbent stevedores from new competition and granted permits to companies that were not doing stevedore work at the Port.  The Port Director conceded that he had not ranked stevedore permit applicants according to need in 2003, 2004, or 2005 and did not know how he would have ranked FTS in those years.

## B.  Seaboard Marine Stevedoring

FTS also introduced evidence showing that FTS could have operated more efficiently than Eller-ITO and other stevedores.  FTS President Gorman testified that by using a mobile harbor crane he purchased in 2000, FTS's "efficiency would be close to triple what [Seaboard Marine's] current . . . stevedore [Eller-ITO's] was" because Eller-ITO used slower, "stick" cranes.  Gorman explained that FTS's faster service would have allowed Seaboard Marine's ships to "go slower and save all that money in fuel and/or overtime in the other ports."  FTS's non-union labor also offered greater flexibility to shippers because International Longshoreman's Association ("ILA") union labor, which Eller-ITO and other stevedores used, could be acquired only with 24 hours' notice.  FTS could provide stevedore labor in as little as four hours.

In addition, trial evidence showed that because FTS used non-union labor, it

74

would have been able to offer stevedore service to Seaboard Marine at a discount relative to Eller-ITO, Seaboard Marine's stevedore in 2003, 2004, and 2005. Forensic accountant Thomas Bastian testified that he examined FTS's cost records, invoices, and financial statements and invoices from Eller-ITO and Florida Stevedoring. Bastian also reviewed invoices from several cruise lines calling at the Port of Miami and labor agreements between the ILA union and FTS's competitors. Bastian testified that FTS's stevedoring rates were "substantially less than the rates being charged by Eller-ITO and Florida Stevedoring."

Based on the differences in stevedoring rates alone, Bastian concluded that Seaboard Marine would have saved $7.5 million by employing FTS from 2003 to 2005 rather than Eller-ITO. Altogether, Bastian concluded that had FTS served as Seaboard Marine's stevedore from 2003 to 2005, FTS would have realized a total net profit of $2.6 million.

Tom Paelinck worked for Seaboard Marine from 1988 to 2007 and was Seaboard Marine's Port of Miami operations manager from 1995 to 1998. Paelinck explained that price was an important factor in deciding which stevedore to hire.

Paelinck further testified that sometimes he was satisfied with Eller-ITO's stevedore services at the Port of Miami and sometimes he was dissatisfied. The

75

Port Director's 1999 needs assessment showed that Seaboard Marine's then-president John Lynch gave Port of Miami stevedores a ranking of 4 out of 10 when asked to evaluate the stevedores' efficiency.

## C. Cruise Line Stevedoring

Leon Sutcliffe was a cruise operations manager for Carnival Cruise Lines. Sutcliffe testified that Carnival used Hallmark Stevedoring, which used ILA labor, for each of its five ships in Miami. Sutcliffe stated that Carnival would have considered a stevedore proposal from FTS between 2003 and 2005.

Another witness was Steve Milan, the senior vice president for land operations of Royal Caribbean Cruise Lines. Milan testified that Royal Caribbean used Eller-ITO for its stevedoring at the Port of Miami. According to Milan, Royal Caribbean would have considered a stevedore proposal from FTS between 2003 and 2005. Accountant Bastian analyzed Eller-ITO stevedoring invoices for Royal Caribbean and concluded that Royal Carribean would have saved $4.2 to 4.3 million from 2003 to 2005 by using FTS rather than Eller-ITO.[47] Bastian concluded that had FTS provided stevedore services to cruise lines from 2003 to

---

[47] Bastian never reviewed Hallmark Stevedoring's records and therefore could not estimate how much money Carnival would have saved had it used FTS.

2005, FTS would have realized a total net profit of $1.1 million.[48]

## D.  Stevedore Contracts

FTS presented no evidence of contractual commitments to provide stevedore services to any shipper or cruise line at the Port of Miami.  But abundant evidence established that shippers and cruise lines would not entertain stevedoring contract proposals if a stevedore lacked the requisite stevedore permit.  Malins-Smith, president of Seafreight Agencies, U.S.A., explained that  "[i]t wouldn't be prudent business practice" to enter into a contract with a stevedore company if that company did not have a permit.  Royal Caribbean also would not have considered a proposal from a stevedore that did not hold a Port of Miami stevedore permit.  Carnival operations manager Sutcliffe said that "one of the first questions that we would ask" of a potential stevedore was "[a]re you licensed or permitted to operate?"

Tom Paelinck of Seaboard Marine expressed similar reservations.  Paelinck spoke with FTS's Gorman in 1998 or 1999 about the possibility of FTS providing stevedore services for Seaboard Marine at the Port of Miami.  Paelinck said, "[T]he

---

[48] Bastian derived these lost-profit figures from per-passenger revenue and cost data and rates based on FTS's stevedore work for Disney Cruise Lines at Port Canaveral.  Bastian's lost-profit figures for cruise lines assumed that FTS would have provided stevedore service for one ship in 2003, two ships in 2004 and three ships in 2005, and did not reflect stevedoring for any particular cruise line.

question was always, do you have a permit to operate?  If you don't have a permit, then we can . . . have a conversation, but you can't really negotiate anything until you have the tools to operate."  Paelinck continued, "If somebody comes up to me and says, 'I'd like to do your stevedoring,' before we even start talking about the prices, we got to talk about . . . can you do this?  Do you have the permit? Do you have the license?"

## E.  Analysis

Viewed in the light most favorable to FTS, we conclude this trial evidence was sufficient to support the jury's damages award.  Considering the evidence of FTS's safety and competence, a reasonable jury could have concluded that FTS would have received a stevedore permit at the Port of Miami had the Port Director lawfully evaluated stevedore permit applications in 2003, 2004, and 2005.  Indeed, the Port Director's form letters automatically denying FTS's permit applications in those years mentioned only the lack of need for new stevedores, rather than concerns about FTS's competence or safety record.  Further, the jury was entitled to conclude that FTS would have received a permit were its application considered on the basis of need because the Port Director renewed the permits of companies that were not even performing stevedore work at the Port.

As to whether FTS would have received stevedore work, ample evidence

showed that FTS would have offered substantially lower stevedoring rates to Eller-ITO's customers, including Seaboard Marine and Royal Caribbean, due to its using non-union labor.[49]  Expert testimony showed that the savings to Seaboard Marine and the cruise lines would have been substantial.  In addition, cruise lines and shippers were open to stevedoring proposals and stated that price was an important consideration in selecting a stevedore.  Seaboard Marine in particular expressed some dissatisfaction with its stevedore, Eller-ITO.  Evidence also supported customers' non-price reasons for choosing FTS, including FTS's more efficient mobile harbor crane and FTS's shorter notice period due to its using non-union labor.

The amount of the jury's damages award was also supported by the evidence.  The jury awarded FTS $2.55 million for FTS's profits lost from Seaboard Marine stevedoring contracts and $1 million for profits lost from cruise line stevedoring contracts, all from 2003 to 2005.  The jury's damages award closely tracked Bastian's expert analysis of FTS's lost profits due to lost Seaboard Marine ($2.6 million) and cruise line ($1.1 million) stevedore work.

---

[49] Due to lack of financial data for Hallmark Stevedoring, Bastian could not evaluate the savings Carnival would have realized from using FTS rather than Hallmark.  However, Bastian's lost-profit calculations were based on FTS cost figures for stevedoring cruise vessels, and, as noted above, did not reflect lost profits from any single cruise line.

The County argues that the jury's damages award was speculative because FTS had no contractual commitments from shippers or cruise lines to provide stevedore service. But the evidence showed that FTS's lack of a stevedore permit at the Port of Miami precluded it from securing binding stevedore agreements. As our discussion above explains, the jury was entitled to conclude that FTS would have received a permit but for the Port Director's unlawful permitting practices. Under the particular factual circumstances in this record, the County's attack on the jury verdict—on grounds that FTS had no binding contracts—fails because the Port Director's unlawful permitting practices precluded FTS from receiving contracts in the first place.

In sum, the evidence provided a sufficient legal basis for the jury's damages award. Accordingly, the district court properly denied the County's motion and renewed motion for judgment as a matter of law.

## VIII. CONCLUSION

For the foregoing reasons, we (1) affirm the district court's grant of summary judgment to FTS as to the County's liability for 2003, 2004, and 2005; (2) affirm the jury's damages award to FTS; and (3) affirm the district court's order granting the County's pre-trial motion in limine excluding from the jury's consideration evidence of FTS's alleged lost profits in 2006 and 2007.

**AFFIRMED.**